UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GENERAL WIRELESS OPERATIONS INC. DBA RADIOSHACK et al.,[1] | Case No. 17-10506 (BLS) |
| | Joint Administration Requested |
| Debtors. | **Hearing Date: TBD** <br> **Objection Deadline: TBD** |

**MOTION FOR ORDER (I) APPROVING ASSUMPTION OF SPRINT SETTLEMENT AGREEMENT; (II) APPROVING REJECTION OF SPRINT ALLIANCE AGREEMENT AND RELATED AGREEMENTS; (III) APPROVING THE RELEASE OF CLAIMS AGAINST SPRINT; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") move (the "Motion"), pursuant to sections 105, 363 and 365 of title 11 of the Bankruptcy Code and Rules 2002, 6003, 6004, 6007, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (I) approving assumption of Sprint Settlement Agreement; (II) authorizing the Debtors to reject the Transaction Documents and the Related Agreements between or among Sprint Solutions, Inc. and certain affiliated entities (collectively, "Sprint") and General Wireless Operations, Inc. ("GWO" and, together with Sprint, the "Parties"); (III) approving the release of certain claims against Sprint; and (IV) granting related relief.  In support of this motion, the Debtors incorporate the statements contained in the Declaration of Dene Rogers in Support of First Day Pleadings (the "First Day Declaration") filed contemporaneously herewith and further respectfully represents as follows:

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: General Wireless Operations Inc. dba RadioShack (8040); General Wireless Holdings Inc. (4262); General Wireless Inc. (9245); General Wireless Customer Service Inc. (5813).  The notice address for all of the Debtors is: 300 RadioShack Circle, Fort Worth, TX 76102-1964.

## JURISDICTION AND VENUE

1.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. sections 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. section 157(b).  The Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.        Venue for this matter is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409.

3.        The bases for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6007 and 9019.

## BACKGROUND[2]

4.        On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.        The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' cases.

---

[2] Notwithstanding Sprint's consent to the filing of this Motion, nothing herein is intended to constitute an admission by Sprint with regard to the facts outlined herein.

#42984707 v13

6.     Simultaneously with the filing of this Motion, the Debtors have sought an order pursuant to Bankruptcy Rule 1015(b) that would provide for the joint administration of these cases and for consolidation for procedural purposes only.

7.     An overview of the Debtors' history and businesses, a summary of the events leading to the commencement of these chapter 11 cases, and the facts supporting this Motion are set forth in the *Declaration of Dene Rogers in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

8.     As noted in the First Day Declaration, the Debtors were formed in early 2015 to purchase and operate certain assets of RadioShack Corporation n/k/a RS Legacy Corporation ("RS Legacy") and certain of its affiliates in Case Nos. 15-10197 (BLS) et seq. (the "Prior Chapter 11 Cases"). On April 1, 2015, the going concern business of RS Legacy was sold through an asset sale (the "General Wireless Sale") to General Wireless Inc. ("General Wireless"). Through the General Wireless Sale, the Debtors acquired 1,733 stores throughout the United States, Puerto Rico, and the U.S. Virgin Islands; the inventory, fixtures, and equipment in those stores; and ownership of certain intellectual property, including the ability to use the RadioShack name in the U.S. and certain foreign markets. The Court approved the General Wireless Sale by orders entered on April 1, 2015 and June 4, 2015, respectively (Case No. 15-10197, D.I. 1672 and 2333).

*The Alliance Agreement and Related Agreements*

9.     A critical element of the Debtors' business plan associated with acquisition of the RadioShack business was a strategic initiative that the Debtors entered into with Sprint simultaneously with the closing of the General Wireless Sale to establish co-branded

#42984707 v13

stores for the sale of Sprint mobile devices, including mobile handsets, tablets, and mobile broadband devices.

10.     Sprint and the Debtors entered into a series of Transaction Documents[3] and other related agreements to implement this strategic initiative. Among the Transaction Documents between Sprint and GWO were: (a) an Amended and Restated Master Strategic Alliance Agreement dated April 1, 2015 (as amended, the "Alliance Agreement"), (b) a multiple site lease agreement dated April 1, 2015 (the "Sprint Primary Sublease Agreement") pursuant to which GWO sublet Sprint space, (c) a second multiple site sublease agreement dated April 1, 2015 (the "Buyer Primary Sublease Agreement") pursuant to which Sprint subleased space to GWO, and (d) the Warrant Agreement and the Investors Rights Agreement.  In addition, the Alliance Agreement identifies certain "Related Agreements," including certain agreements not included among the Transaction Documents (and including all agreements identified in, or entered into in connection with, the Alliance Agreement, the "Related Agreements").  A description of certain of the Transaction Documents and Related Agreements is set forth below:

(a)     Alliance Agreement.  The Alliance Agreement is a summary of the overall business relationship between the Debtors and Sprint and, in particular, provides that Sprint will have the right to be the exclusive mobility provider in the GWO stores and that GWO and Sprint will operate more than one thousand cc-branded stores.

(b)     Buyer Primary Sublease Agreement.  In connection with the General Wireless Sale, GWO took an assignment of approximately 1,204 store leases

---

[3] Such term, as used herein, shall have the meaning ascribed to in the Settlement Agreement.

from RS Legacy, becoming the tenant under those leases. The Buyer Primary Sublease Agreement provides that GWO, as tenant, will sublease to Sprint a certain area within each of the affected Premises (as such term is defined in that agreement) to allow Sprint to operate a "store within a store." The Buyer Primary Sublease Agreement contains various standards to assure the joint retail success of the operations at each of the Premises, and makes clear that it is subordinate in all respects to the terms of the master lease governing each of the Premises.

(c)   Sprint Primary Sublease Agreement.   Also in connection with the General Wireless Sale, various Sprint entities took an assignment of approximately 529 store leases from RS Legacy, and thus became the tenant under those leases. The Sprint Primary Sublease Agreement provides that each Sprint entity, as tenant, will sublease to GWO area within each of the affected Premises (as such term is defined in that agreement) to allow GWO to operate a "store within a store." The Sprint Primary Sublease Agreement contains various standards to assure the joint retail success of the operations at each of the Premises, and also makes clear that it is subordinate in all respects to the terms of the master lease governing each of the Premises.

(d)   Related Agreements.  The Alliance Agreement also provides for the parties to enter into certain "Related Agreements, including "the Investor Rights Agreement, the MSA Amendment, the Pre-Paid Distribution Agreement, as amended and the Operations, Management and Staffing Agreement." These agreements address various issues including, without limitation, investor rights, retail sales and commissions thereon, and personnel sharing.

#42984707 v13

11.     Under the terms of the Alliance Agreement and certain of the Related Agreements, Sprint would operate Sprint stores within the RadioShack stores known as "Sprint Team at RadioShack" or "STAR." In exchange for the exclusive use of prime RadioShack floor space, Sprint agreed to pay approximately a third of the rent, to split profits with RadioShack from the sale of wireless accessories, and to pay RadioShack commissions on phones sold in RadioShack stores.

12.     The parties projected that the arrangement between the Debtors and Sprint would convert the RadioShack mobility business from a financial burden into a profit center for GWO.  The rent payments commenced as stores opened, and commission payments were to begin as soon as Sprint generated $60 million of sales commissions in RadioShack stores.  In other words, Sprint was entitled to keep the first $60 million of commissions for itself, but thereafter would be required to pay them to RadioShack. This $60 million threshold amount was expected to be achieved during the 2016 calendar year.

13.     The Sprint relationship did not yield the benefits that the Debtors anticipated.  The estimated cash commissions were originally projected to provide a significant cash flow for RadioShack, but due to decreased Sprint sales, the payout of these commissions was delayed. Had such payments been made in the manner and amounts projected by the Debtors, the funds received would have been sufficient to allow the Debtor to raise new capital to cover one-time legacy liabilities, service impending debt obligations, and restore the Company to financial stability.

14.     In the fourth quarter of 2016, Sprint mobility sales dropped precipitously. As a result, the company projected it would not receive cash commissions from Sprint until 2018, and the amount of such payments was in doubt. The company's many stakeholders, who expected

#42984707 v13

GWO to receive cash commissions in the middle of 2016, questioned whether the company would ever receive the significant commission payments contemplated by the Alliance Agreement.

15.    Management attempted in late 2016 and early 2017 to convince Sprint to make the payments the Debtors' believed to be originally contemplated under the Agreement or to renegotiate the terms of the Agreement, but was unable to achieve a satisfactory resolution of these issues.

16.    Following extensive negotiations between the Debtors and Sprint, the Debtors determined that an orderly termination of their business relationship was warranted. Consequently, on March 5, 2017 GWO and Sprint executed a Mutual Settlement and Release, Operations Wind Down, And Bankruptcy Cooperation Agreement (the "Settlement Agreement"), described below, to wind down and separate operations from each other in an expeditious and mutually agreed fashion and settle and release all disputes between the Parties. A copy of the Sprint Settlement Agreement is attached hereto as Exhibit 2. The Debtors believe that assumption of the Settlement Agreement will maximize the value of the Debtors' estates, and now seek authority to assume that Agreement, to reject the Transaction Documents and Related Agreements with Sprint, and to approve the release of claims against Sprint on the terms and under the procedures set forth in the Settlement Agreement.

## RELIEF REQUESTED

17.    The Debtors request entry of an order:   (I) approving the settlement evidenced by the Sprint Settlement Agreement and the Debtors' assumption of Sprint Settlement

#42984707 v13

Agreement; (II) authorizing the Debtors to reject the Transaction Documents and the Related Agreements[4] between Sprint and GWO effective, <u>nunc pro tunc</u>, as of the Petition Date; (III); subject to the investigation and challenge right preserved to any Creditor Representative in Section 8.1 of the Settlement Agreement, approving the release of claims against Sprint on the terms stated in the Settlement Agreement (the "<u>Release</u>"); and (IV) granting related relief.

***Terms of Settlement Agreement and Release***

18.    The Settlement Agreement provides[5] for payment of $12 million to GWO (the "<u>Initial Wind Down Payment</u>") upon the Debtors' performance of the following conditions:

(i)    The assignment of the 115 Buyer Primary Stores listed in Exhibit B to the Settlement Agreement and valued by Buyer at $6,800,000, as more fully described in Section 4.1, which assignments became effective upon Buyer's receipt of the Initial Wind Down Payment pursuant to the Assignment of Leases (the "115 Store Lease Assignment") attached hereto as <u>Exhibit 3</u>.

(ii)    The transfer of the assets as described in Section 4.6 for the 115 Buyer Primary Stores listed in Exhibit B to the Settlement Agreement and 245 Sprint Primary Stores listed in Exhibit C to the Settlement Agreement (such 360 stores the "<u>Sprint Retained Stores</u>"), valued by Buyer at $9,000,000, which assignments became effective upon Buyer's receipt of the Initial Wind Down Payment.

(iii)    The return of the Sprint inventory in STAR Assist Program locations as more fully described in Section 5.1 of the Settlement Agreement.

(iv)    Providing information related to sales performance in the Sprint Primary Stores.

Settlement Agreement, § 2.

19.    The Initial Wind Down Payment was paid by a wire transfer made to GWO on March 6, 2017.

---

[4] Termination Agreements with respect to the Buyer Primary Sublease Agreement and the Sprint Primary Sublease Agreement were executed in connection with the Settlement Agreement. Subject to the provisions of the Settlement Agreement and those Termination Agreements, rejection of those subleases pursuant to this Motion accordingly is sought to the extent the Subleases remain unexpired.

[5] This summary is provided for illustrative purposes only. To the extent of any inconsistency between the summary and the terms of the Settlement Agreement itself, the terms of the Settlement Agreement shall control.

20.    As noted above, the Debtors assigned to Sprint the 115 leases identified in the 115 Store Lease Assignment on March 6, 2016.  Pursuant to the terms of the 115 Store Lease Assignment, Sprint has assumed and is now obligated for all obligations of tenant under those leases, whether arising before or after the date of assignment.[6]

21.    The Settlement Agreement provides for an additional $5 million (the "Holdback") to be paid by Sprint to the Debtors upon the expiration of an Investigation Period (as discussed below) if (i) no claims are brought by the Debtors' lenders or an official committee of unsecured creditors of the Debtors (the "Committee"), should one be appointed in the case, against Sprint, and (ii) a Final Order is entered by the Bankruptcy Court approving the Release. A secured creditor or a Committee may designate one or more "Creditor Representative(s)" to investigate claims against Sprint for a period of 75 days after the Petition Date or 60 days after the appointment of the Committee, whichever period is shorter (the "Investigation Period"), and seek to obtain standing to file claims against Sprint (the "Creditor Representative Claim"), and file any claim on behalf of the Debtors' estate.  If a Creditor Representative Claim is timely filed within the Investigation Period, the Holdback is deemed forfeited and Sprint is not required to pay the Holdback.

22.    If no Creditor Representative Claim is filed during the Investigation Period, then the following Release, if approved by the Court, would go into effect:

---

[6] The 115 Store Lease Assignment was effected in accordance with the assignment rights afforded the parties under the Court's April 1, 2015 Order approving the sale of certain assets to General Wireless Inc. in In re RadioShack Corp., Case No. 15-10197 (BLS) (D.I. 1672, ¶ 24).  Consequently, as of the Petition Date the Debtors were no longer parties to the leases identified in the 115 Store Lease Assignment and Sprint has assumed all obligations thereunder.  This Motion constitutes a request for approval of the assumption and assignment of those leases to Sprint pursuant to 11 U.S.C. § 365 to the extent, if at all, that the Court were to conclude that the Debtors retained any residual interest in those leases as of the Petition Date, which the Debtors and Sprint do not believe to be the case.

Release.  In consideration for the execution of the Settlement Agreement and payment of the Wind Down Payment, Buyer agrees to seek and to use commercially reasonable best efforts to obtain a full and complete release (the "Release"), approved by a final order ("Final Order") in the Bankruptcy Case, of any claims or causes of action whatsoever, known or unknown, accrued or unaccrued, asserted or unasserted, that Buyer, its owners, agents, officers, employees, stockholders, directors, successors and assigns, (in each case, in their capacities as such), or the bankruptcy estate, may have against Sprint and any wholly-owned affiliate or wholly-owned subsidiary of Sprint or of Sprint Communications, Inc., including but not limited to Sprint Communications, Inc., Sprint Solutions, Inc., Sprint eWireless, Inc., Sprint Spectrum L.P., SprintCom, Inc., Sprint PCS Assets, L.L.C., APC Realty and Equipment Company, LLC. and their owners, agents, officers, employees, stockholders, directors, successors and assigns, including but not limited to any Sprint employee or representative who at any time served as a Board Observer on the Buyer's board of directors or who may be alleged to have served as a Director on Buyer's board of directors; provided however, nothing herein shall constitute a release of Buyer's rights or Sprint's obligations under this Agreement, the Assignment, the Transition Agreement or any Post Termination Rights.

Settlement Agreement, § 8.1.

23.     If the Release does become effective, the following "Buyer Release," under which Sprint (and certain parties related to Sprint) would release claims against the Debtors (and certain parties related to the Debtors), would also go into effect:

Sprint agrees to grant a full and complete release (the "Buyer Release"), of any claims or causes of action whatsoever, known or unknown, accrued or unaccrued, asserted or unasserted, that Sprint, its owners, agents, officers, employees, stockholders, directors, successors and assigns, (in each case, in their capacities as such), may have against Buyer and any wholly-owned affiliate or wholly-owned subsidiary of Buyer and their owners, agents, officers, employees, stockholders, directors, successors and assigns, including but not limited to any Buyer employee or representative; provided however, nothing herein shall constitute a release of Sprint's rights or Buyer's obligations under this Agreement, the Assignment, the Transition Agreement or any Post Termination Rights or of Sprint's rights to collect the Sprint Investor Reimbursement, currently valued at approximately ~$18,000,000.

Settlement Agreement, § 8.2.

24.     Pursuant to this Motion, the Debtors request entry of an order approving the Release.

#42984707 v13

Other Material Provisions

25.     The Settlement Agreement also contains crucial provisions intended to ensure an orderly transition of and exit from the co-branded stores.  Specifically, section 4 of the Settlement Agreement sets forth detailed provisions for exit by the Debtors or Sprint, respectively, from stores subleased from the other, for the handling of inventory liquidation and FF&E sales at those locations, and for other operational matters related to the exit by one party or both from various of the subleased locations.  Finally, Section 4.1 of the Settlement Agreement provides for the assignment by GWO to Sprint of its leases for 115 stores being exited by the Debtors, and the transfer to Sprint of certain FF&E at those 115 stores and 245 additional Sprint-Retained Stores.  As noted, those transfers were effected on March 6, 2017.

## BASIS FOR RELIEF REQUESTED

26.     Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Settlements and compromises are generally favored in bankruptcy cases.  *See, e.g., Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY, ¶ 9019.03[1] (15th ed. 1993)).  Indeed, settlements are "'a normal part of the process of reorganization.'" *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) (quoting *Case v. LA. Lumber Prods. Co.,* 308 U.S. 106, 130 (1939)).

27.     To approve a compromise and settlement under Bankruptcy Rule 9019(a), a bankruptcy court must make an independent determination that the compromise and settlement is in the best interests of the debtor's estate.  *See In re Marvel Entnm't Group, Inc.,* 222 B.R. 243, 249 (D. Del. 1998) (citing *Anderson,* 390 U.S. at 424); *In re Louise's, Inc.,* 211 B.R. 798,

#42984707 v13

801 (D. Del. 1997). *See also Vaughn v. The Drexel Burnham Lambert Group, Inc. (In re The Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (decision to either accept or reject a compromise and settlement is within the sound discretion of the bankruptcy court). The court may consider the opinions of the trustee or debtors-in-possession in determining that the settlement is fair and equitable. *See In re Key3Media Group, Inc.,* 336 B.R. 87, 93 (Bankr. D. Del. 2005) (citing *In re Mickey Thompson Entnm't Group, Inc.,* 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003)); *In re The Drexel Burnham Group, Inc.,* 134 B.R. at 505. In addition, the bankruptcy court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.,* 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

28.     A bankruptcy court need not decide the numerous issues of law and fact raised by a settlement, but rather "should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness." *Key3 Media,* 336 B.R. at 93 (citing *In re Jasmine, Ltd.,* 258 B.R. 119, 123 (D.NJ. 2000)); *In re Coram Healthcare Corp.,* 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("[C]ourt must only conclude that the compromise or settlement falls within the reasonable range of litigation possibilities.") (citing *In re Penn Central Transp. Co.,* 596 F.2d 1102, 1114 (3d Cir. 1979). A full evidentiary hearing to determine the merits of the underlying litigation is not required under Bankruptcy Rule 9019. *See In re Capmark Fin. Group Inc.,* 438 BR 471, 515 (Bankr, D. Del. 2010) (citing *Jasmine,* 258 B.R. at 123); *Key3 Media,* 336 B.R. at 93; *In re Purofied Down Prods. Corp.,* 150 B.R. 519, 522 (S.D.N.Y. 1993) (noting that the court "need not conduct a 'mini-trial' to determine the merits of the underlying litigation" being settled).

29.     Thus, the dispositive question is not whether a better result might have been reached if litigation between the Settling Parties was fully pursued. Rather, settlements

should be approved so long as a minimal threshold of reasonableness is satisfied. *See, e.g., In re Nutritional Sourcing Corp.,* 398 B.R. 816, 833 (Bankr. D. Del. 2008) ("In considering a proposed settlement, the court's duty is to determine whether the compromise is reasonable, not whether the compromise is the best possible settlement."); *Coram,* 315 B.R. at 330; *In re Sea Containers Ltd., No.* 06-11156, 2009 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008) ("[The] court . . . need not be convinced that the settlement is the best possible compromise.").

30.     In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following factors: (i) the probability of success in the litigation; (ii) the difficulties associated with collection; (iii) the complexity of the litigation, and attendant expense, inconvenience and delay; and (iv) the paramount interests of creditors. *See, e.g., Martin,* 91 F.3d at 393; *In re RFE Indus., Inc.,* 283 F.3d 159, 165 (3d Cir. 2002); *In re Nutraquest, Inc.,* 434 F.3d 639, 644 (3d Cir. 2006).

31.     The proposed settlement is fair and reasonable, is in the best interests of the Debtors' estates and their creditors and should therefore be approved.  The Settlement Agreement is the product of extensive good faith, arm's-length negotiations between and among the Debtors and Sprint.  Furthermore, each of the foregoing relevant factors militates in favor of this Court's approval of the Settlement Agreement.

32.     First, the Settlement Agreement provides significant benefits to the Debtors and their Estate in the form of (i) an orderly wind down of the Debtors' operations at the co-branded stores subleased from Sprint, and the separation of the operations between the Debtors and Sprint in an expeditious and mutually agreed manner; and (ii) an additional $5 million consideration for a Release in the event there is no timely filed Creditor Representative Claim.  The Settlement Agreement and its agreed upon wind down and separation provisions are

#42984707 v13

of critical importance to the Debtors and serve the interests of the Debtors' creditors by allowing the Debtors to focus on an orderly liquidation of their assets without expensive and time-consuming litigation with Sprint. Without the Settlement Agreement, the Debtors could spend many months untangling their business operations and years litigating with Sprint over their respective rights and obligations under the Transaction Documents and Related Agreements. That litigation would result in significantly increased expenses to the estate, delayed store closing sales and lease rejections, and delays in distributions to creditors. The Settlement Agreement creates a clear path forward in these Bankruptcy Cases.

33. Second, the Wind Down Payment that Sprint is providing under the Settlement Agreement is reasonable in light of the obligations under the Transaction Documents and the Settlement Agreement. The Debtors already have received an immediate $12,000,000 to assist in the wind down of certain of its operations in an orderly fashion, and will receive an additional $5,000,000 if there is no timely Creditor Representative Claim brought against Sprint.

34. Third, the issues and related disputes that will arise under the Transaction Documents are factually and legally complex and the settlement embodied in the Settlement Agreement will avoid continued protracted, expensive and uncertain litigation. The issues between the Debtors and Sprint and the legal disputes that arise therefrom are fact intensive, potentially time consuming, and would be costly to litigate. The Settlement Agreement resolves those matters without the need to incur the time and costs associated with litigating them.

35. When measured against the likelihood of delay and expense to the Debtors and these Bankruptcy Cases and the prospect of protracted litigation with uncertain results, the Settlement Agreement is fair and reasonable, falling well above "the lowest point in the range of reasonableness." Accordingly, the Debtors submit that approval of the Settlement Agreement is

in the best interests of the estates and their creditors, and respectfully requests that the Court approve the Settlement Agreement and authorize the Debtors to perform the obligations thereunder.

***The Debtors' Business Judgment on Assumption and Rejection Is Entitled to Deference***

36.    Section 365(a) of the Bankruptcy Code authorizes a debtor to assume or reject an executory contract. 11 U.S.C. § 365(a). Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). Courts routinely approve motions to assume, assume and assign or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts to authorize the rejection of an executory contract is that of "business judgment"); see also In re Taylor, 913 F.2d 102 (3d. Cir. 1990); In re Buckhead America Corp., 180 B.R. 83 (Bankr. D. Del. 1995).

37.    Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease. See In re Trans World Airlines, Inc., 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice." (internal quotations omitted)). The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. N.L.R.B. v. Bildisco (In re Bildisco), 682 F.2d 72, 79 (3rd Cir. 1982) (noting that the "usual test for rejection of an executory contract is simply whether rejection would benefit the estate") aff'd, 465 U.S. 513. Further,

#42984707 v13

"[s]ection 365 enables the trustee to maximize the value of the debtor's estate by assuming

executory contracts and unexpired leases that benefit the estate and rejecting those that do not."

L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.), 209 F.3d 291, 298

(3d Cir. 2000); see also Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735,

741 (5th Cir. 1996) (section 365 of the Bankruptcy Code "allows a trustee to relieve the

bankruptcy estate of burdensome agreements which have not been completely performed").

38.    As previously noted, the Settlement Agreement is contract whose approval

and assumption will benefit the Debtors' estates and bring finality and clarity to what could

otherwise be a muddled or contentious situation.  Therefore, the Debtors should be permitted to

exercise their business judgment to assume the Settlement Agreement.

39.    The Debtors should also be permitted to exercise their business judgment

to be given the authority to reject the Transaction Documents and the Related Agreements, nunc

pro tunc, to the Petition Date in order to comply with the terms of the Settlement Agreement,

reduce the quantum of administrative claims to be asserted against the Debtors' estates and

eliminate any confusion that might occur as a result of a piece-meal rejection of these contracts.

40.    The assets and operations of Sprint and the Debtors are intertwined.

Through the operation of the Transaction Documents (as well as the Related Agreements), Sprint

and the Debtors (through Operations) share leased space, use common employees, sell similar or

identical goods and services, and have developed common intellectual property, among other

things.

41.    Because of the complexity of the Sprint business relationship, the parties

expressly anticipated that the Debtors would have up to sixty (60) days to sell off and/or remove

property *after* the underlying agreements terminated.

(a)        Section 15.2 of the Alliance Agreement provides, in pertinent part: "Upon expiration or termination of this Agreement: … [Operations] will … (iii) at its expense, within a reasonable period of time (not to exceed sixty (60) days) remove all of Buyer's Equipment from" the Sprint stores.

(b)        Section 12(g) ("Subtenant's Bankruptcy") of the Sprint Primary Sublease Agreement begins: "In the event of a voluntary bankruptcy filing by Subtenant … *regardless of whether or not the Alliance Agreement is terminated* …." The next paragraph then provides that the subtenant, Operations, may hold going-out-of-business sales on premises: "Subtenant may cease operations at any Premises or conduct going out of business or inventory liquidation sales at any Premises, provided that Subtenant shall use commercially reasonable efforts to do so in a manner that minimally interferes, to the extent possible, with the operation of Sublandlord's business at the applicable Property and only one going out of business or inventory liquidation sale may take place at each Property during the Term and in no event may such going out of business or inventory liquidation sale at a Property exceed a duration of sixty (60) days …"

42.      Nonetheless, gradual rejection of the various contracts would put the Debtors' estates at risk of incurring additional administrative expense liability for obligations that bring little or no benefit to the estates and, relative to the certainty provided by the Settlement Agreement, could result in disputes with landlords regarding the proper effective date of lease rejection for leaseholds sublet to and partially occupied by Sprint.

43.      Consequently, to the extent that the Transaction Documents and Related Agreement have not already terminated or expired, the Debtors should be given the authority to reject these agreements, nunc pro tunc, to the Petition Date.

## NOTICE

44.      Notice of this Motion shall be given to (a) the office of the United States Trustee for the District of Delaware; (b) Sprint and its counsel; (c) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (d) all parties who have requested service of notices in these cases; (e) all landlords under the 115 Store Lease Assignment, and (f) all parties who are known by the Debtors to assert liens against the Debtors' inventory and FF&E. The Debtors submit that no other or further notice need be provided.

#42984707 v13

## NO PRIOR REQUEST

45.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached as Exhibit 1 hereto: (I) approving assumption of the Sprint Settlement Agreement; (II) authorizing the Debtors to reject the Transaction Documents and Related Agreements effective as of the Petition Date; (III) approving the Release against Sprint on the terms and subject to the Creditor Representative Challenge Rights set forth in the Settlement Agreement, and (IV) granting such other relief as the Court deems just and proper.

Dated: March 10, 2017

Respectfully submitted

**PEPPER HAMILTON LLP**

David M. Fournier (DE Bar No. 2812)
Michael J. Custer (DE Bar No. 4843)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Tel: (302) 777-6500
Fax: (302) 421-8390
Email: fournierd@pepperlaw.com
        custerm@pepperlaw.com

*Proposed Attorneys for Debtors
and Debtors-in-Possession*

#42984707 v13